IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY LARSSON | : CIVIL ACTION |
| | : |
| v. | : NO.  24-5506 |
| | : |
| MAGNUM TRANSACTION SUB, LLC, | : |
| AVA WEINSTEIN-ATZRAM, LCSW | : |

## MEMORANDUM

**MURPHY, J.**                                                                                    **March 9, 2026**

After attending a conference in May of 2022, Amy Larsson contracted COVID-19.  She

returned to work full-time about two weeks later, but her symptoms persisted long after.

Meanwhile, defendant Lyric — Ms. Larsson's longtime employer — was undergoing its own

turmoil, preparing to separate from its parent company through a forced divestment.  Ms.

Larsson and her supervisor were busy with preparing the company for divestment, but things

quickly changed.  By December of 2022, the supervisor determined that Ms. Larsson's role

should be eliminated because it was an unnecessary layer of supervision and expense, and Lyric

terminated Ms. Larsson the next month.  Ms. Larsson concluded that her termination was

because of her long COVID symptoms, and sued Lyric for disability discrimination, interference

with her medical leave, and for creating a hostile work environment.  But at the close of

discovery, the record does not support Ms. Larsson's claims.  Because no reasonable jury could

sustain any of Ms. Larsson's claims, we grant Lyric's motion for summary judgment in its

entirety.

## I.    Background

Amy Larsson worked at Change Healthcare Technologies LLC, from 1994 until 2022.

DI 51-3 at ¶¶ 2-3.  In 2014, she began reporting to Carolyn Wukitch.  *Id.* at ¶ 4.  But in January

2021, UnitedHealth Group announced its plans to acquire Change. *Id.* at ¶ 9. Amid antitrust concerns and an attempt by the Department of Justice to block the acquisition, Change's ClaimsXten business — under which both Ms. Larsson and Ms. Wukitch worked — was to be divested from Change. *Id.* at ¶¶ 8-11. In anticipation of ClaimsXten's divestment, Ms. Larsson and Ms. Wukitch assisted in preparing ClaimsXten for sale as a stand-alone business, including its structure and organization. *Id.* at ¶¶ 12-14.

Ms. Larsson tested positive for COVID-19 on May 8, 2022 after attending a Change sales conference. *Id.* at ¶ 15. Ms. Larsson was out of work from May 8, 2022, when she tested positive, until May 16, 2022, when she began working part time as she continued to recover. *Id.* at ¶ 18. On May 23, 2022, Ms. Larsson returned to work full time. *Id.* at ¶ 19. Ms. Wukitch, who also contracted COVID after attending the same conference, was aware of Ms. Larsson's illness and that she had had taken time off and worked part time off to recover from COVID. *Id.* at ¶¶ 16-17, 20.

In September 2022, prior to the divestment, Ms. Wukitch decided that CJ Belanger, who previously reported to Ms. Larsson, would directly report to Ms. Wukitch at the new company. *Id.* at ¶¶ 39-40. Ms. Wukitch was concerned that Ms. Belanger, who she viewed as a subject matter expert, would resign if required to report directly to Ms. Larsson, and the decision for Ms. Belanger to report directly to Ms. Wukitch was to ensure that Lyric was able to retain Ms. Belanger. *Id.* at ¶¶ 41-42, 47. Ms. Larsson was thus assigned the "go-to-market" role, and Ms. Belanger was given the "Product Management" role ahead of the divestment. *Id.* at ¶ 48.

By October 4, 2022, ClaimsXten was purchased by defendant Magnum Transaction Sub, LLC, now known as Lyric, a healthcare technology company that "provides solutions to increase

payment accuracy for healthcare payers."[1]  *Id.* at ¶¶ 1, 7.  Ms. Wukitch was chosen to be Lyric's CEO, and Ms. Larsson expressed an interest in being a part of Lyric upon its divestment.  *Id.* at ¶¶ 30, 31.  Ms. Wukitch was involved in the process of selecting employees from change that would be offered positions at Lyric, and approved of Ms. Larsson as one such employee.  *Id.* at ¶¶ 32-33. Ms. Larsson's role included oversight of both solution design and marketing.  *Id.* at ¶ 129.

Following her return to work in May of 2022, Ms. Larsson continued to experience COVID symptoms even after the transition to Lyric in October that year.  *Id.* at ¶¶ 23, 56.  That October, Ms. Larsson spoke with Lyric's VP of People Solutions, Deanna Andrews.  *Id.* at ¶ 72. During that conversation Ms. Larsson and Ms. Andrew discussed Ms. Larsson potentially "going out on disability," what her options were, and what that process would look like, among other things.  *Id.*  Ms. Andrews encouraged Ms. Larsson to take care of herself and informed her that Lyric was still under the benefits plan that was in place at Change.  *Id.* at ¶ 73.  Change also continued to administer medical leave, including leave under the Family Medical Leave Act (FMLA), through June of 2023.  *Id.* at ¶ 74.  At the time she spoke with Ms. Andrews, Ms. Larsson was undecided on whether to seek medical leave because she thought she might recover from her symptoms.  *Id.* at ¶ 75.

Ms. Andrews and Ms. Wukitch subsequently discussed Ms. Larsson's health condition and continued need for flexibility in her work schedule.  *Id.* at ¶ 82.  Soon after, on November 18, 2022,  Ms. Andrews left her role as VP of People Solutions and moved into doing administrative work remotely on a limited schedule.  *Id.* at ¶ 89.  Her replacement was Jeff Fix,

---

[1] We refer to Magnum as "Lyric" throughout this memorandum.

who was contracted to work as Lyric's Interim Chief Resources Officer. *Id.* at 91. During Mr. Fix and Ms. Andrew's brief overlap, the two never discussed Ms. Larsson's ongoing health problems. *Id.* at ¶ 93.

In early December of 2022, Ms. Larsson informed Ms. Wukitch of her "Long COVID" symptoms and that she would be seeking treatment through a long COVID program, though the specifics of that program were not discussed.[2] *Id.* at ¶¶ 24-26. Ms. Larsson requested that Ms. Wukitch give her some flexibility with her schedule to attend doctors' appointments or receive other treatment for her symptoms, and Ms. Wukitch granted that request. *Id.* at ¶¶ 27-28. During the time she was initially out of work after contracting COVID, Ms. Larsson used her "unlimited Discretionary Paid Time Off." *Id.* at ¶ 21. That policy continued at Lyric following the company's divestment from Change. *Id.* at ¶ 54. So, when Ms. Larsson requested flexibility in her schedule to treat her long COVID symptoms, Ms. Wukitch told Ms. Larsson that she could use her unlimited discretionary PTO to do so, which Ms. Larsson did. *Id.* at ¶¶ 28-29.

Also in December of 2022, Ms. Wukitch asked Lyric's board to step down from her position as CEO, as she thought doing so was best for the business and she was concerned about the ability to spend time with her family. *Id.* at ¶¶ 95-96. At the request of the board, Ms. Wukitch stayed on while Lyric found a replacement, but ultimately stepped down to become Lyric's Chief Operating Officer on in April of 2023. *Id.* at ¶¶ 97-99. Ms. Wukitch's position change was accompanied by another. On December 4, 2022, Amy Churchill was hired as the senior director of marketing, which was open following the resignation of the previous director

---

[2] Ms. Larsson had informed Ms. Wukitch of her long COVID symptoms prior to the transition to Lyric. DI 51-3 at ¶¶ 56-57.

of marketing.[3]  *Id.* at ¶¶ 100-101.  Ms. Churchill was to "stand up the marketing function" for Lyric.  *Id.* at ¶ 107.

Ms. Wukitch held monthly leadership meetings with her leadership team, including Ms. Larsson, which were run by Ms. Wukitch and her chief of staff, Deb Hankins.  *Id.* at ¶¶ 61-63, 108-109.  In December of 2022, during one such leadership meeting, Ms. Larsson stepped out of the meeting.  *Id.* at ¶ 110.  Ms. Larsson was absent from the meeting for approximately 90 minutes to two hours.  *Id.*  When she returned to the meeting, Ms. Larsson asked questions about what she had missed while she was gone.  *Id.* at ¶ 116.  Ms. Hankins testified that while Ms. Larson asking questions was not unusual for someone who had stepped out of a leadership meeting, the length depth of her questions was, and that "annoyed" Ms. Hankins.[4]  *Id.* at ¶ 117-118.  Ms. Wukitch testified that she found Ms. Larsson's return disruptive, and found Ms. Larsson's tone to be "negative," which created friction among the team.  *Id.* at ¶¶ 120-21.  Noting that there was "tension in the room," Ms. Wukitch called for a break in the meeting.  *Id.* at ¶ 122.

That December, Ms. Wukitch decided that the elimination of Ms. Larsson's position was appropriate.  *Id.* at ¶ 125.  The parties have different versions of the reason for Ms. Wukitch's decision: Ms. Wukitch claims that she made the decision to eliminate Ms. Larsson's position because it was unnecessary to Lyric's success, but as Ms. Larsson sees it, the decision was to eliminate Ms. Larsson and replace her with a non-disabled employee.  *Id.*  By then, Ms. Andrews

---

[3] Although not entirely clear who exactly hired Ms. Churchill, Ms. Larsson was involved in the decision to hire her.  DI 51-3 at ¶ 102.

[4] Ms. Hankins said she would have been similarly annoyed with any other executive who did the same.  *Id.* at ¶ 119.

had left Lyric and was not involved in Ms. Larsson's termination. *Id.* at ¶¶ 126, 128. Ms. Wukitch testified that upon considering Lyric's organization and "go-to-market approach," Lyric's solution design department would be better suited under its sales department. *Id.* at ¶ 131.

Another leadership meeting was scheduled for January 2023. *Id.* at ¶ 134. Ahead of that meeting, Ms. Hankins sent an email to the leadership team members' executive assistants. *Id.* The email said: "There is an onsite meeting January 19 & 20. Please make sure calendars are cleared for those 2 days. During the last meeting folks had to step out at various times and it was very disruptive." *Id.* at ¶ 135. Ms. Larsson's assistant forwarded Ms. Hankins' email to her. *Id.* at ¶ 138. On January 20, 2023, Ms. Larsson was informed, in a meeting with Ms. Wukitch and Mr. Fix, that her position had been eliminated. *Id.* at ¶ 140. Prior to her termination, Ms. Larsson never formally requested FMLA leave from either Change or Lyric, and never discussed the potential of FMLA leave with Ms. Wukitch. *Id.* at ¶¶ 78, 81.

## II.    Procedural Posture

Ms. Larsson brings claims for: (1) disability discrimination under the Americans with Disabilities Act (ADA) and the Pennsylvania Human Relations Act (PHRA); retaliation on the basis of her disability under the ADA and PHRA; (3) retaliation under the FMLA; (4) leave interference under the FMLA; and (5) hostile work environment under the ADA and PHRA. DI 24 at ¶¶ 116-142.

## III.    Standard of Review

Plaintiffs opposing summary judgment must "point to concrete evidence in the record that supports each and every essential element of [her] case." *Nitkin v. Main Line Health*, 67

6

F.4th 565, 571 (3d Cir. 2023) (citation modified).  Mere "bare assertions, conclusory allegations, or suspicions" will not do.  *Id.* (citation modified).  Viewing the facts in the light most favorable to Ms. Larsson and drawing all reasonable inferences in her favor, we will grant summary judgment if there is no genuine dispute as to any material fact and Lyric is entitled to judgment as a matter of law.  *Id.*; Fed R. Civ. P. 56(a).

IV.    **Discussion**

The record before us is inadequate for any of Ms. Larsson's claims to reach trial.  For each of her five claims, Ms. Larsson would ask a fact finder to reach conclusions unsupported by facts and reasonable inferences and would require speculation.  Even crediting her allegations, Ms. Larsson does not successfully cast doubt on Lyric's legitimate, nondiscriminatory reasons for her termination.  No reasonable jury could see it Ms. Larsson's way.  As such, we grant Lyric's motion for summary judgment on all of Ms. Larsson's claims.

**A. Ms. Larsson's disability discrimination claims are dismissed**

Disability discrimination claims are analyzed under the burden shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Gardner v. Ulta Salon Cosmetics and Fragrance Inc.*, 2024 WL 110384, at *1 (3d Cir. March 14, 2024) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F,3d 661, 667-68 (3d Cir. 1999).  Under that framework, Ms. Larsson must first make a *prima facie* showing of disability discrimination.  *Id*. (citing *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009)).  The burden then shifts to Lyric to offer a "legitimate, non-discriminatory reason" for Ms. Larsson's termination.  *Id.* at *2 (citation modified).  If Lyric can do so, the burden shifts back to Ms. Larsson to show that Lyric's reason for her termination was pretextual.  *Id.*  Because claims for disability discrimination claims under

the ADA and PHRA apply the same standard, we analyze those claims together. *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214 & n.21 (3d Cir. 2024) ("Absent an act of the Pennsylvania legislature or guidance from Pennsylvania courts that the ADAAA is inconsistent with the PHRA, federal courts should continue to interpret the PHRA in harmony with the ADA.").

A *prima facie* case of disability discrimination requires Ms. Larsson to show: (1) she is 'a disabled person within the meaning of' the [ADA]; (2) she is 'otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer'; and (3) she 'has suffered an otherwise adverse employment decision as a result of discrimination.'" *Id.* (quoting *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)) (citation modified). Lyric does not challenge that Ms. Larsson's long COVID constitutes a disability under the ADA or that she was qualified to perform the duties of her job, so we focus only on whether she suffered from an adverse employment decision because of her disability. DI 50-1 at 8-9.

While Ms. Larsson must point to evidence suggesting that she was terminated as a result of her long COVID, the burden at the *prima facie* stage "is not intended to be onerous." *Hollingsworth v. R. Home Property Management, LLC*, 498 F. Supp. 3d 590, 603 (E.D. Pa. 2020) (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)) (citation modified). Ms. Larsson argues that under Third Circuit precedent, "the evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination *could* be a reason for the employer's action." *Marzano v. Computer Science Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996)

8

(emphasis in original); DI 51 at 5.  We agree because, as the Third Circuit has explained, "most employment discrimination claims seek to prove intent by inference," so to impose too high of an evidentiary burden at step one of the *McDonnell Douglas* framework would require something more than an inference of discrimination.  *Marzano*, 91 F.3d at 508.

In support of her *prima facie* case, Ms. Larsson provides a long recitation of purportedly undisputed facts which she believes links her termination with her disability.  DI 51 at 5-8. Those facts boil down to what Ms. Larsson views as the dubious timing surrounding the deterioration of her health and the termination of her position, and the fallout from Ms. Larsson's departure from and return to the December 2022 leadership team meeting — including the email from Ms. Hankins discouraging leadership team members from leaving the leadership meetings. *Id.*  The chain of inferences connecting each of these events to Ms. Larsson's termination is attenuated.  But because discrimination "could" be a reason for Lyric's termination of Ms. Larsson, we conclude she meets her initial burden here.  *Marzano*, 91 F.3d at 508.

In response, Lyric clearly articulates a legitimate nondiscriminatory reason for Ms. Larsson's termination: Ms. Wukitch testified that as Lyric evolved its sales and go-to-market approach, she determined Ms. Larsson's position to be an unnecessary layer of supervision and expense.  DI 50-1 at 18; DI 50-11 at  167:16-168:14.  That is a sufficient reason.  *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason."); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993) (discharge for economic reasons and preference for another employee over plaintiff was legitimate, nondiscriminatory reason for dismissal); *see Deville v. Givaudan Fragrances Corp.*, 419 F. App'x 201, 206 (3d Cir.

2011) (merger rendered plaintiff's position redundant).

With that, the burden shifts back to Ms. Larsson to show that Lyric's reason for discharging her is pretext. At this stage, while we draw all reasonable inferences in Ms. Larsson's favor, "mere allegations are insufficient, and only evidence sufficient to convince a reasonable factfinder merits consideration at this stage." *Fowler v. AT & T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (citation modified). In other words, Ms. Larsson may not survive summary judgment by relying on her own speculation about the reasons for her termination. Instead, her evidence must be concrete such that a reasonable fact finder could find for her. *Nitkin*, 67 F.4th at 571.

Ms. Larsson's is insufficient. She correctly explains that a plaintiff may show pretext "by pointing to evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." DI 51 at 11 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). What might suffice at the *prima facie* stage is not always sufficient at the pretext stage, however, because "the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity[.]" *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998). Ms. Larsson is correct that "[i]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." DI 51 at 11 (quoting *Fuentes*, 32 F.3d at 764). But that does not mean a plaintiff survives summary judgment automatically because they pass the *prima facie* stage.

10

As the authority Ms. Larsson cites to explains:

> We can reject out of hand the two extreme positions: that the plaintiff can avoid summary judgment simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations on the one hand, or that the plaintiff must adduce evidence directly contradicting the defendant's proffered legitimate explanations on the other . . . .  The correct solution lies somewhere in between: to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]

*Fuentes*, 32 F.3d at 764 (emphasis in original).  Ms. Larsson's evidence falls closer to the first of these two positions described in *Fuentes*.  In essence, Ms. Larsson argues that a reasonable jury could disbelieve Lyric's legitimate nondiscriminatory reasons for terminating her because her version of events suggests that discrimination could be the reason for her termination.  While that may be sufficient at the *prima facie* stage, it is insufficient to cast reasonable doubt on Lyric's legitimate nondiscriminatory reason.  *Simpson*, 142 F.3d at 646.  In a world without *McDonnell Douglas*, another way of saying this might be that the net evidence of discrimination is insufficient for a reasonable jury.

We are similarly unpersuaded by the additional evidence Ms. Larsson offers to show pretext.  Ms. Larsson argues that Lyric has been incoherent in its reason for terminating her.  DI 51 at 12.  An employee's termination may often be motivated by multiple legitimate, nondiscriminatory reasons.  *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005) (explaining that under *McDonnell Douglas*, "[i]f the employer articulates *one or* more" legitimate, nondiscriminatory reasons that the adverse action was taken, the burden shifts to the plaintiff to show pretext); *Hart v. Twp. of Hillside*, 228 F. App'x 159, 162 (3d Cir. 2007) (affirming summary judgment where "the defendants provided multiple legitimate, non-discriminatory

11

reasons" for adverse action); *Carlson v. Township of Lower Alloways Creek*, 452 F. App'x 95, 100 (3d Cir. 2011) (same). Here, the reasons for Ms. Larsson's termination were both organizational and fiscal. DI 50-11 at 167:16-168:14. Without more, the mere fact that Lyric has provided other explanations justifying Ms. Larsson's termination would not permit a juror to reasonably disbelieve Lyric's legitimate, nondiscriminatory reasons for her termination.

Nor do we agree with Ms. Larsson that Lyric's reasons for her termination are belied by the record. While Ms. Larsson questions the timing of the circumstances here, she cannot dispute that at the time of her termination Lyric had just recently been divested from Change and was in the process of becoming a stable, stand-alone business. DI 50-3 at ¶¶ 12-14. Indeed, before Ms. Larsson's termination, Ms. Wukitch herself had requested to step down from her position as CEO because she believed it was best for the business. *Id.* at ¶¶ 95-96. Our job is not to assess "whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Simpson*, 142 F.3d at 647 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d at 1109 (3d Cir. 1997)) (citation modified). Because Ms. Larsson's arguments against pretext amount to the mere suggestion that the "factfinder need not believe the defendant's proffered legitimate explanations," *Fuentes*, 32 F.3d at 764, we grant Lyric's motion for summary judgment on her disability discrimination claim.

### B.  Ms. Larsson's ADA, PHRA, and FMLA retaliation claims are dismissed

Continuing to apply the *McDonnell Douglas* framework, Ms. Larsson's retaliation claim under the ADA and PHRA will be dismissed for similar reasons as her disability discrimination claim. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (retaliation claims under ADA and FMLA analyzed under *McDonnell Douglas* framework). The elements

of a claim for retaliation under the ADA, PHRA, and FMLA are "essentially the same," so we address them together. *Garcia v. Vertical Screen*, 592 F. Supp. 3d 409, 422 (E.D. Pa. 2022) (Robreno, J.); *Samuel Grossi*, 49 F.4th at 346 (analyzing retaliation claims under Title VII, § 1981, the ADA, and FMLA together).[5] Ms. Larsson's retaliation claims require her to show: "(1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* (citation modified). As with Ms. Larsson's claims for disability discrimination, Lyric contests only the third element. DI 50-1 at 15-16.

The causation element may be shown by a "broad array of evidence," including the temporal proximity between the protected activity and the adverse action, "intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels v. School. Dist. of Philadelphia*, 776 F.3d 181, 196-97 (3d Cir. 2015) (citation modified). Ms. Larsson relies mostly on temporal proximity. DI 51 at 10. She says that because she requested and was granted medical leave throughout the summer and fall of 2022, and the decision to terminate her was made "[m]ere weeks later," the temporal proximity of the two is "unusually suggestive" such that a reasonable jury could infer a causal connection. *Id.*

We disagree. As the Third Circuit has explained, its precedent is "seemingly split on the

---

[5] In the FMLA context, the protected activity may include requesting or taking FMLA leave. *See Garcia*, 592 F. Supp. 3d at 422. In the ADHD and PHRA context, protected activity may include requesting a reasonable accommodation or a complaint regarding a prohibited activity. *Id.*

question of whether the timing of the allegedly retaliatory action can, by itself, ever support a finding of causation." *Kern v. DAS Companies Inc.*, 2025 WL 2170324, at *9 & n.4 (3d Cir. July 31, 2025) (citing *Krouse*, 126 F.3d at 503). However, "even assuming that timing, without more, is enough, 'unusually suggestive' timing has generally been understood to mean no more than a handful of days, which is not the case here." *Id.* (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *Doe v. C.A.R.S. Protective Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008)). The period between Ms. Larsson's purported protected activity and her termination is not unusually suggestive.

Ms. Larsson also says that she "can further establish a pattern of antagonism in the weeks leading up to the termination" because "negative comments" by Ms. Wukitch and Ms. Hankins evince a pattern of antagonism. DI 51 at 11. Again, we are unpersuaded. Ms. Larsson does not provide a citation to the record to show a pattern of antagonism, but we assume that she refers to Ms. Wukitch's comment that Ms. Larsson's departure and return to the December 2022 leadership meeting created tension, and Ms. Hankins's email discouraging leadership team members from stepping out from the meeting. DI 51-3 at ¶¶ 122, 135. Neither of these comments is antagonistic. In fact, Ms. Larsson admits that "no one directly made negative statements regarding her Long COVID to her." *Id.* at ¶ 6. But even if they were negative, they do not amount to a "pattern of antagonism" that would make an inference of retaliation reasonable. *Bartos v. MHM Correctional Services, Inc.*, 454 F. App'x 74, 78 (3d Cir. 2011) (several disciplinary actions were not a pattern of antagonism where they were not "consistent and continuous[.]"); *Duong v. Benihana National Corporation*, 2022 WL 1125392, at *5 (3d Cir. April 15, 2022) ("one description of an isolated incident" and a "single comment" were

14

insufficient to show pretext for retaliation); *Roberts v. American Airlines*, 599 F. Supp. 3d 222, 231 (E.D. Pa. 2022) (holding that "a series of minor incidents across months" was not pattern of antagonism and explaining that "a pattern of antagonism occurs where an employee is subject to a constant barrage of written and verbal warnings and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until discharge") (citation modified).

As explained above, Lyric's proffered fiscal and organizational reasons for Ms. Larsson's termination are legitimate and nondiscriminatory. *See* section IV.A, *supra.* Ms. Larsson is unable to demonstrate those reasons are pretext for retaliation — both because Lyric's reasons are not inconsistent as Ms. Larsson contends, and because this record does not evince unusually suggestive timing or a pattern of antagonism. *Id.*; *Duong*, 2022 WL 1125392, at *5. Because Ms. Larsson is unable to satisfy the causal connection element of her *prima facie* case for retaliation under the ADA, PHRA, and FMLA — and because even assuming she could make out a *prima facie* case, she cannot show Lyric's legitimate nondiscriminatory reason for terminating her is pretext — we dismiss Ms. Larsson's retaliation claims under the ADA, PHRA, and FMLA.

### C. Ms. Larsson's FMLA interference claim will be dismissed

We move next to Ms. Larsson's FMLA interference claim. To satisfy a claim of FMLA interference, Ms. Larsson is required to show: (1) she was an eligible employee under the FMLA; (2) Lyric was an employer subject to the FMLA; (3) she was eligible to take FMLA leave; (4) she notified Lyric of her intention to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA. *Id.* at 191-92. Lyric argues that Ms. Larsson did not provide notice of her intention to take FMLA leave, and that she was not denied

any benefits she was entitled to under the FMLA.  DI 50-1 at 18 n.9.  Even assuming that Ms. Larsson could show she put Lyric on notice of her intention to take FMLA leave, we dismiss her interference claim for lack of any evidence that she was denied leave under the FMLA.

Unlike a claim for discrimination, a claim for FMLA interference "is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Philadelphia*, 430 F.3d 117, 120 (3d Cir. 2005).  So, "for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually *withheld*." *Ross v. Gilhuly*, 755 F.3d 185, 192 (3d Cir. 2014) (citation modified).  An interference claim based on an employee's termination which allegedly interferes with an employee's "entitlement to take FMLA leave free from later discrimination confuses interference with retaliation and is thus misdirected." *Id.* (citation modified).  That is the case here.

The record indicates that Ms. Larsson was encouraged, not discouraged, to take the leave she needed.  For example, when Ms. Larsson purportedly inquired about FMLA leave, Ms. Andrews encouraged her to take care of herself and informed her that Lyric was still under the benefits plan that was in place at Change.  DI 51-3 at ¶ 73.  When Ms. Larsson discussed treatment of her condition with Ms. Wukitch, Ms. Wukitch granted her request for flexibility with her schedule and reminded her of the availability of her unlimited PTO.  *Id.* at ¶¶ 27-28. And when Ms. Larsson was initially out of work after contracting COVID, she successfully used that PTO.  *Id.* at ¶ 21.

That Lyric somehow withheld FMLA leave from Ms. Larsson is therefore unsupported. *Caplan v. L Brands/Victoria's Secret Stores*, 704 F. App'x 152, 155 (3d Cir. 2017) (holding that "even if [plaintiff] provided adequate notice of her need for FMLA leave and Victoria's Secret

failed to provide her with a FMLA eligibility notice, her claim still fails because she cannot show

that she was denied benefits. She received and took all of the paid time off she wanted[.]").  To

the extent Ms. Larsson argues that she was terminated because of her expressed intent to take

FMLA leave, such a claim "confuses interference with retaliation," and we have already

dismissed Ms. Larsson's retaliation claims for the reasons iterated above.  *Ross v. Gilhuly*, 755

F.3d at 192; *Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) (explaining that a

plaintiff "cannot escape the *McDonnell Douglas* analysis to prove his case merely by affixing an

'interference' label to one of his duplicative claims."); *Lichtenstein v, University of Pittsburgh*

*Medical Center*, 691 F.3d 294, 312 n.25 (3d Cir. 2012) (citing *Atchison*, 666 F. Supp. at 489)

(same).  Ms. Larsson's FMLA interference claim is dismissed.

### D.    Ms. Larsson's hostile work environment claim will be dismissed

Ms. Larsson's last claim is one for a hostile work environment based on her disability.  A

claim for a hostile work environment based on disability requires a showing that Ms. Larsson:

(1) is disabled; (2) was subject to unwelcome harassment; (3) which was based on her disability;

(4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment

and to create an abusive working environment; and (5) that Lyric knew or should have known of

the harassment and failed to take prompt and effective remedial action.[6] *Walton*, 168 F.3d at

666-67.  "The Supreme Court has emphasized that 'conduct must be extreme' to satisfy this

standard, so 'simple teasing, offhand comments, and isolated incidents (unless extremely

---

[6] "The Third Circuit has assumed without specifically deciding that claims may be brought pursuant to the ADA for a hostile work environment under substantially the same framework as a Title VII hostile work environment claim." *Hanafy v. Hill International, Inc.*, 669 F. Supp. 3d 419, 439 & n. 8 (E.D. Pa. 2023) (Beetlestone, C.J.) (citation modified).  We cite to authority discussing hostile work environment claims under Title VII accordingly.

serious)' are inadequate." *Nitkin*, 67 F.4th at 570 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Citing to a single, conclusory paragraph in her supplemental statement of undisputed material facts, Ms. Larsson argues that this claim should proceed to trial because she "was subjected to unfounded hostility, humiliation, exclusion, and ultimately termination." DI 51 at 22-24. Specifically, the paragraph Ms. Larsson cites incorporates various excerpts from her deposition testimony, none of which supports the conclusion she reaches. DI 51-4 at ¶ 22. To send Ms. Larsson's hostile work environment claim to trial would require crediting unreasonable factual assertions and conclusory allegations. *Nitkin*, 67 F.4th at 571; *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 133 (3d Cir. 2006) ("we need not credit the non-movant's conclusions of law or unreasonable factual inferences."). We decline to do so. But even crediting her self-serving allegations, the record here falls well short of the kind of "extreme" conduct which could permit a hostile work environment claim to reach trial. *Nitkin*, 67 F.4th at 570 (citation modified). Like her other claims, Ms. Larsson's hostile work environment claim is dismissed.

## V. Conclusion

Ms. Larsson's claims are predicated on a chain of inferences too speculative to reach a jury. As with any other case of discrimination, a plaintiff may not reach trial because discrimination could conceivably be motivated by a discriminatory animus — such cases require a reasonable evidentiary basis on which a jury could find in her favor. Because none exists on this record, we grant Lyric's motion for summary judgment on all claims.